# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                   Respondent,<br><br>   v.<br><br>HAROLD SPENCER GEORGE,<br><br>                   Appellant. | No.  46323-7-II<br>(Consolidated with No. 46326-1-II)<br><br><br><br>UNPUBLISHED OPINION |

MAXA, J. — In a consolidated appeal, Harold Spencer George appeals his convictions from two separate bench trials.  The first trial resulted in a conviction for three counts of first degree child molestation, and the second trial resulted in a conviction for failure to register as a sex offender.

Regarding the first degree child molestation convictions, we hold that (1) the State presented sufficient evidence to prove that he had sexual contact with the victim and to prove three instances of molestation, (2) substantial evidence supported the trial court's finding of fact that on five occasions George took the victim into the master bedroom and locked the door, and (3) George's multiple additional claims asserted in a statement of additional grounds (SAG) have no merit.

Regarding the failure to register as a sex offender conviction, we hold that (1) the trial court did not err in admitting an investigating officer's report even though it was disclosed

shortly before trial, (2) the trial court did not err in admitting George's statements to two investigating officers made before he was advised of his *Miranda*[1] rights, (3) the State presented sufficient evidence to support George's failure to register as a sex offender conviction, (4) substantial evidence supported the trial court's three findings of fact regarding whether George was living at his registered address, and (5) George waived any claim about an officer's comment on George's credibility by failing to object at trial.

Accordingly, we affirm George's conviction for three counts of first degree child molestation and his conviction for failure to register as a sex offender.

FACTS

George married Mary Moran-George, who had a daughter, AQ, and a son, TK, from previous relationships. In 2007, George and Moran-George moved into a house in Graham with AQ and TK.

*Case 1 - Child Molestation*

In 2012, when AQ was 10 years old, she told Moran-George that George had been touching her inappropriately. Shortly after this disclosure, Moran-George took AQ to confront George at George's mother's house. Either during or shortly after the confrontation, AQ recanted. George continued to live with Moran-George, AQ, and TK in the house in Graham.

At some point in late 2012 or early 2013, George and Moran-George separated and George left the home. In April 2013, AQ told Moran-George that her earlier disclosure was true. After this second disclosure, Moran-George called 911 to report the abuse. Dr. Yolanda

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Duralde, medical director of the Child Abuse Intervention Department at Mary Bridge Hospital, performed a medical exam on AQ. Dr. Duralde saw no physical evidence of abuse.

George was arrested and interviewed by Detective Gary Sanders. Sanders read George his *Miranda* rights and interviewed George for about 20 to 30 minutes before, according to Sanders, George got nervous and asked for an attorney.

The State charged George with three counts of first degree child molestation.[2] George waived his right to a jury trial and proceeded with a bench trial. AQ, TK, Moran-George, Duralde, Sanders, and George testified at trial.

At trial, AQ testified that George would take her into the master bedroom and lock the door. She said that he would take off her pants and underwear, then take off his pants and underwear, and then move on top of her so his private part touched her private part. George would do this until AQ felt a warm liquid on her stomach.

AQ was vague about some of the details of these incidents. Her testimony revealed some uncertainty about how old she was when the incidents occurred and when she first disclosed them. When asked how many times the molestation occurred, AQ said that it probably happened more than two times but was not sure whether it happened more than three times. She then gave a rough estimate that the molestation occurred five times.

TK testified that he saw George and AQ go into the master bedroom four or five times and that the door would be locked. He listened at the door, but did not hear anything.

---

[2] The State also charged George with one count of violating a protective order and one count of furnishing liquor to a minor. However, those charges were severed from the three charges of child molestation and dismissed without prejudice after George was convicted of the three counts of child molestation.

George testified at trial and denied molesting AQ. He noted that AQ recanted after first accusing him of molesting her. He heard nothing further about the accusation until he was arrested. A week before he was arrested, his wife accused him of having an affair with another woman.

The trial court found George guilty of all three counts of first degree child molestation and entered findings of fact and conclusions of law.

*Case 2 - Failure to Register as a Sex Offender*

As a result of prior convictions for felony sex offenses, George was required to register as a sex offender. George initially registered his address as a home in Tacoma upon his release from custody in 2007. In July 2010, George completed a change of address form to show his residence as the house in Graham that he shared with Moran-George, AQ, and TK. He did not file any other change of address forms after July 2010.

On April 22, 2013, Officer Anita Dillon of the Puyallup Tribal Police Department contacted George in response to a runaway juvenile report regarding TK. She met George at the Puyallup Tribal administration building parking lot. She did not give George the *Miranda* warnings. George talked with Dillon and told her that TK had spent the weekend with him. George also told Dillon that he (George) had been staying with a friend. Dillon told George that he should update his address with the sex offender registry. Dillon did not arrest George or question him about his residence.

Detective Oliver Hickman of the Pierce County Sheriff's Department later received a tip from Dillon on the sex offender database, which said that George was separated from his wife and living at a friend's house in Tacoma. Hickman followed up on the tip by calling Moran-

4

George. After his conversation with Moran-George, Hickman believed that the tip was correct and that George was not living at his registered address in Graham.

Hickman, with the help of Puyallup Tribal police, located George at work. Tribal police arrested and handcuffed George and brought him to Hickman. Hickman introduced himself to George, telling him that he was a detective from the sex offender registration unit and that he was there because he received a tip that George was no longer living at his registered address. George responded by saying that he did not know what to do because there was a restraining order that prevented him from living at the Graham address. At that point Hickman stopped George and read him the *Miranda* rights.

The State charged George with one count of failure to register as a sex offender during the period between March 29 and May 2, 2013. George waived his right to a jury trial. The trial court conducted a CrR 3.5 hearing for the statements George made to Dillon and Hickman and ruled that both sets of statements were admissible. After a bench trial, the trial court found George guilty.

George appeals his three convictions for first degree child molestation and his conviction for failure to register as a sex offender.

ANALYSIS: FIRST DEGREE CHILD MOLESTATION

A.    SUFFICIENCY OF EVIDENCE

George argues that the State presented insufficient evidence to support a conviction for three counts of first degree child molestation because AQ's testimony was too vague to prove that George had sexual contact with her or to prove three instances of molestation. We disagree.

5

1.    Standard of Review

When evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). We will assume the truth of the State's evidence and all reasonable inferences drawn from that evidence when evaluating whether sufficient evidence exists. *Id.* at 106. We also will defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Id.*

2.    Evidence of Molestation

George argues that AQ's testimony was insufficient to prove that any molestation occurred because it was filled with unsure statements about what happened. George points out that AQ used words such as "I think" and "I suppose" and also that AQ recanted her initial disclosure. George also argues that AQ changed her testimony about how she first disclosed and that she had a motive to lie.[3] In addition, George argues that Moran-George had a motive to lie because she thought George was having an affair.

However, we view the evidence in the light most favorable to the State. These arguments address only AQ's and Moran-George's credibility. Although AQ's testimony was vague in some respects and she was unsure about the specifics of the incidents, AQ clearly testified that George molested her. George's arguments relate to AQ's credibility, not sufficiency of the evidence. Similarly, George's arguments about AQ's and Moran-George's motives relate to

---

[3] George raises essentially the same argument in his SAG, where he argues that AQ's testimony lacked credibility and was inconsistent with other testimony.

6

credibility. We do not review the trier of fact's credibility determinations. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

George also argues that the State's evidence was insufficient because Dr. Duralde found no physical evidence of abuse. Further, George testified that he did not molest AQ and did not have an opportunity to molest her because people were always coming and going in the house. However, Dr. Duralde also testified that based on AQ's description of how she was molested, she did not expect to find any physical evidence of abuse. And AQ testified that George molested her. We defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Homan*, 181 Wn.2d at 106.

Accordingly, we hold that the State presented sufficient evidence to show that George molested AQ.

### 3. Evidence of Three Incidents

In sexual abuse cases where multiple counts are alleged to have occurred in the same charging period, the State need not elect particular acts associated with each count as long as the evidence clearly delineates specific and distinct incidents of sexual abuse during the charging period. *State v. Edwards*, 171 Wn. App. 379, 401, 294 P.3d 708 (2012). A three-prong test is used to determine whether generic testimony about a course of sexual abuse sufficiently describes specific and distinct incidents of abuse in order to support a conviction. *Id.* at 402. The alleged victim must (1) describe the act or acts with sufficient specificity to allow the jury to determine what offense, if any, has been committed, (2) describe the number of acts committed with sufficient certainty to support each count, and (3) be able to describe the general time period in which the acts occurred. *Id.*

7

The first prong requires a sufficient description of the acts at issue. In *State v. Hayes*, the case in which the three-prong test was created, Division One of this court held that the first prong was met when the victim testified that the defendant "put his private part in mine." 81 Wn. App. 425, 438, 914 P.2d 788 (1996). That statement alone sufficiently described the act to allow the trier of fact to determine what offense had been committed, but the court noted that additional details added to the specificity. *Id.* The victim described the defendant's usual course of conduct, testifying that it happened in his bed, with him on top of her, and that he used paper towels to clean up afterward. *Id.*

AQ's testimony was as detailed as the testimony in *Hayes* and similarly described the usual course of conduct instead of a specific incident. AQ testified that George would take her into the master bedroom, take off her pants and underwear, undress himself from the waist down, and move his private part back and forth over AQ's private part. She testified that the events happened in the same way every time. Accordingly, AQ's testimony describes the act with sufficient specificity to satisfy the first prong.

The second prong requires the victim to describe the number of acts with sufficient certainty to support each count. In *Hayes*, the court held that the victim's statements that it happened at least "four times" and up to "two or three times a week" was enough to support conviction on four counts of rape of a child. 81 Wn. App. at 439. Under *Hayes*, the testimony does not need to be certain about the specific number of acts. The victim can give varying estimates and still satisfy the prong as long as the victim's estimates support the counts charged.

Here, George was charged with three counts of child molestation. Although AQ's answers were somewhat unclear as to exactly how many times she was molested, none of her

8

answers indicate that it happened fewer than three times. AQ said it "[p]robably" happened more than two times. 3 Report of Proceedings (RP) at 181. She answered she was "not sure" if it happened *more than* three times, but that uncertainty would not prevent the trier of fact from concluding beyond a reasonable doubt that it happened three times. 3 RP at 181. In addition, when asked to give an estimate, AQ testified that the molestation happened five times. Because all of AQ's answers indicate that George molested her three or more times, her testimony is sufficiently certain to support each count. Therefore, AQ's testimony satisfies the second prong.

The third prong requires the victim to testify to the general time period in which the acts occurred. In *Hayes*, the charging period was based on the victim's testimony that the acts occurred while she was living alone with Hayes, while she was living with Hayes and his girlfriend, and after she and Hayes moved out of the girlfriend's house. 81 Wn. App. at 427, 429. The court held that the third prong was satisfied. *Id.* at 439. In *Edwards*, the victim testified that she was touched the first time when she was five or six. 171 Wn. App. at 403. However, the victim failed to define the time period when the other 10 to 15 encounters occurred. *Id.* Accordingly, this court held that only one of the two counts was supported by the testimony. *Id.*

Here, AQ testified that she was in fourth grade when the acts occurred and that she was ten or possibly nine years old. AQ was born in November 2001, which means that she turned nine in November 2010 and turned 10 in November 2011. The charging period was January 1, 2008 to September 1, 2012. AQ clearly defined the time period by giving the grade she was in and her age when the acts occurred. Further, the charging period encompasses the period that AQ described. Accordingly, AQ's testimony satisfies the third prong.

9

Because AQ's testimony satisfies all three prongs, we hold that her testimony sufficiently described specific and distinct incidents of abuse in order to support George's conviction for three counts of child molestation.

B.      FINDING OF FACT REGARDING THE MASTER BEDROOM

George argues that the trial court's finding that while living in the Graham home George took AQ into the master bedroom and locked the door on at least five occasions, is not supported by substantial evidence. We disagree.

When reviewing the sufficiency of evidence following a bench trial, we determine whether substantial evidence supports the challenged finding of fact and whether the findings support the trial court's conclusions of law. *State v. Smith*, 185 Wn. App. 945, 956, 344 P.3d 1244, *review denied*, 183 Wn.2d 1011 (2015). Substantial evidence is evidence that is sufficient to persuade a fair-minded, rational person that the findings are true. *Id.* The party challenging the finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence. *Id.* at 957.

George argues that there is not substantial evidence supporting the trial court's finding that George took AQ into the master bedroom at least five times because AQ testified that she was not sure if this happened more than three times. However, AQ specifically testified that George took her into the master bedroom an estimated five times. In addition, TK testified that he saw George take AQ into the master bedroom and lock the door on about four or five occasions. George's arguments address only AQ's credibility and the trial court's resolution of conflicting testimony.

10

Based on AQ's and TK's testimony, a fair-minded, rational trier of fact could be persuaded that George took AQ into the bedroom at least five times. Accordingly, we hold that finding of fact IV was supported by substantial evidence.

C.      SAG CLAIMS[4]

1.   Improperly Raised Claims

George asserts that substantial evidence did not support the trial court's findings of fact and that his trial counsel had a conflict of interest. Although RAP 10.10(c) does not require the appellant to refer to the record or cite authority, he is required to inform us of the "nature and occurrence of alleged errors." Because George does not specify what findings of fact are unsupported and does not explain how his trial counsel had a conflict of interest, his claims are too vague to allow this court to identify the issues. Therefore, we cannot reach those claims.

George also argues that AQ was not a credible witness. However, we do not review the trier of fact's credibility determinations. *Thomas*, 150 Wn.2d at 874. Therefore, we reject that claim.

2.   Fifth Amendment Rights

George asserts that Sanders's testimony that George got nervous and stopped answering questions was an impermissible comment on George's right to remain silent. We agree that Sanders's comment was improper, but hold that the error was harmless.

The Fifth Amendment of the United States Constitution guarantees a defendant the right to be free from self-incrimination. *State v. Pinson*, 183 Wn. App. 411, 416-17, 333 P.3d 528

---

[4] George attached various documents to his SAG. We do not consider documents that are not in the trial court record. RAP 10.10(c).

(2014). Accordingly, a defendant has a right to remain silent both before and after an arrest. *Id.* at 417. A police witness may not comment on the defendant's silence so as to infer guilt from the defendant's refusal to answer questions. *State v. Embry*, 171 Wn. App. 714, 749, 287 P.3d 648 (2012).

At trial, George's counsel asked Sanders whether his questioning of George about AQ lasted five to 10 minutes, and Sanders replied, "Yeah. Because he asked for an attorney. . . . He got nervous and stopped answering questions." 4 RP at 429. Sanders's comment arguably violated George's Fifth Amendment rights by improperly inferring guilt from George's decision to invoke his right to remain silent.

However, a constitutional error is harmless if we are convinced beyond a reasonable doubt that the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *State v. Burke*, 163 Wn.2d 204, 222, 181 P.3d 1 (2008). Here, George's counsel promptly moved to strike Sanders's comments. The trial court granted the motion, ruling, "I will consider the rest of the statement that he made as nonresponsive in regards to invoking his rights. That's not relevant to the Court, and I will not consider it as part of this case." 4 RP at 430.

Although Sanders gave improper testimony, the court properly struck the comment about George's invocation of his right to remain silent. And the untainted evidence overwhelmingly leads to a finding of guilt. Accordingly, we hold that the error was harmless.

3. Admission of Hearsay

George asserts that the trial court erred by allowing the admission of hearsay evidence, specifically testimony from AQ about TK's girlfriend, N, and AQ's neighborhood friend, K,

which violated the confrontation clause of the Sixth Amendment to the United States Constitution. We disagree because AQ did not provide hearsay testimony.

ER 801(c) provides the definition of hearsay: "[A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." And ER 802 provides that "[h]earsay is not admissible except as provided by these rules, by other court rules, or by statute." We review the admission of evidence for abuse of discretion. *State v. Alvarez-Abrego*, 154 Wn. App. 351, 362, 225 P.3d 396 (2010). A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *Id.*

AQ testified that she told TK's girlfriend, N, about George touching her. She also testified that either TK overheard the conversation or N told TK about it, because TK later told Moran-George. AQ did not provide any other testimony regarding N. AQ did not testify to any statements made by N. And to the extent AQ suggested that N may have said something to TK about what AQ told her, that testimony was not offered for the truth of the matter asserted. Instead, it was offered to show how and why TK could have said something about George to Moran-George. Therefore, AQ did not offer any hearsay regarding N.

In a pretrial interview AQ said that when she recanted her first disclosure about George she said that her friend, K, had told her to make up the accusations. But AQ clarified that K never told her to make up accusations against George and that AQ made up the story about K when she recanted. Again, there was no hearsay regarding K because AQ never offered any statements from K for their truth.

13

Because AQ's testimony about N and K did not involve any statements for the truth of the matter asserted, there was no hearsay. Accordingly, because AQ's statements were not hearsay, we hold that the trial court did not err in admitting them.

4. *Brady* Violation

George asserts that the State committed a *Brady*[5] violation by failing to disclose relevant evidence from N and K. We disagree.

There is no *Brady* violation where a defendant possesses the salient facts regarding the existence of the evidence that he claims was withheld. *State v. Mullen*, 171 Wn.2d 881, 902, 259 P.3d 158 (2011). Therefore, "[i]f the nondisclosed information was available through the defense's own due diligence, there is no suppression under *Brady*." *Id.* at 903.

Here, the record shows that George had knowledge of both N and K from defense counsel's pretrial interviews with AQ. Therefore, George could have exercised his own due diligence to interview N and K for additional information. Further, there is no evidence that the State interviewed N or K or possessed any additional information about them beyond what George knew. Accordingly, we hold that there was no *Brady* violation.

5. Prosecutorial Misconduct

George asserts that the prosecutor committed misconduct during questioning by eliciting improper opinion testimony and during closing argument by vouching for witnesses' credibility, arguing facts not in evidence, and calling George a liar. We disagree.

---

[5] *United States v. Brady*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

a. Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Misconduct is prejudicial if there is a substantial likelihood it affected the verdict. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). However, a defendant waives any error by failing to object to the prosecutor's improper conduct, unless that conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Id.* at 760-61.[6]

b. Opinion Testimony

George asserts that the prosecutor intentionally elicited improper opinion testimony from Duralde and Sanders. We disagree.

"Generally, no witness may offer testimony in the form of an opinion regarding the defendant's guilt or veracity." *State v. Rafay*, 168 Wn. App. 734, 805, 285 P.3d 83 (2012). Such opinion testimony unfairly prejudices the defendant because it "invades the exclusive province of the jury to make an independent determination of the relevant facts." *Id.*

George claims the prosecutor flagrantly asked Dr. Duralde her opinion on issues, but he does not inform the court what part of Duralde's testimony was improper. Therefore, we will not consider this assertion. RAP 10.10(c).

George asserts that Sanders provided improper opinion testimony when he said that George asked for an attorney because he got nervous. However, as discussed above, that

---

[6] Here, George failed to object to the alleged misconduct. However, because we hold that almost all of the prosecutor's conduct was proper, we do not address waiver except with regard to one of the prosecutor's statements in closing argument.

testimony came during the examination by George's counsel, and George successfully moved to strike the comment.

The prosecutor did not elicit any improper opinion testimony from either Duralde or George. Accordingly, we hold that the prosecutor did not commit misconduct on this basis.

      c.    Vouching for Witnesses

George asserts that the prosecutor improperly vouched for the credibility of AQ, TK, and Moran-George. We disagree.

Improper vouching occurs if the prosecutor (1) places the prestige of the government behind the witness by expressing his or her personal belief as to the veracity of the witness or (2) indicates that evidence not presented at trial supports the witness's testimony. *State v. Robinson*, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015). George argues that the State used the first method of vouching, by expressing belief as to the veracity of AQ's, TK's, and Moran-George's testimony.

In *Robinson*, Division One of this court held that the prosecutor's statement that a witness had " 'no motive to fabricate that' " and "no reason to lie about this" was not vouching because the prosecutor was simply drawing inferences from the evidence and was not implying knowledge of facts outside of the evidence. *Id.* at 893.

Here, the prosecutor referenced the testimony given by AQ, TK, and Moran-George that George did not continue to live in the house with them after AQ disclosed the inappropriate touching for the second time and 911 was called. The prosecutor stated in closing,

> And just thinking about it from [AQ], [TK] and [Moran-George's] perspective, what motive would they have to lie about where he lived? They have no motive

> to lie about that. That has nothing to do with whether or not [AQ] got molested. They really don't have a motive to say he didn't live there when he did.

4 RP at 470. The prosecutor did not express her own belief as to the veracity of the witness. Like the prosecutor in *Robinson*, the prosecutor here made statements based on the evidence and reasonable inferences that can be made from the evidence.

The prosecutor did not improperly vouch for the witnesses. Accordingly, we hold that the prosecutor did not commit misconduct on this basis.

#### d. Facts Not in Evidence

George asserts that the prosecutor argued from facts not in evidence when she made comments in closing about typical behavior for sex abuse survivors. We disagree on some comments, and hold that George waived his claims for other improper comments.

It is improper to argue facts not in evidence. *State v. Turner*, 167 Wn. App. 871, 882, 275 P.3d 356 (2012). A prosecutor commits misconduct by urging the jury to convict based on evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). But prosecutors enjoy a wide latitude in arguing reasonable inferences from the evidence. *State v. Davis*, 175 Wn.2d 287, 338, 290 P.3d 43 (2012).

Here, the prosecutor said in closing argument, "[AQ] didn't want to talk about it, which is not unusual. Children can go for years without disclosing. Some never do." 4 RP at 448. The prosecutor went on to say, "There's not a checklist of behaviors: Counseling, check; nightmares, check; bad grades, check, and this equation equals victim of molestation. It just doesn't work that way. You look at the individual. You look at the child. You look at the circumstances." 4 RP at 448.

17

The prosecutor's comment about AQ not wanting to talk about the molestation was a reasonable inference from the evidence. AQ testified that she didn't like talking about it. And Dr. Duralde, who performed AQ's exam, testified that some victims decline counseling because they "just don't want to think about it" and want to forget it. 2 RP at 144. Accordingly, we hold that the prosecutor did not commit misconduct on this basis.

However, the prosecutor's other comments – about how some children go for years without disclosing or never disclose and about a checklist of victim behaviors – are statements that cannot be inferred from the evidence. Therefore, those statements were improper. But they caused minimal prejudice and were not flagrant and ill intentioned, and a proper objection could have cured any harm. Accordingly, we hold that George waived this error by failing to object at trial.

> e. Calling George a Liar

George asserts that the prosecutor committed misconduct by expressing her personal opinion about George's credibility and guilt by calling him a liar during her closing argument. We disagree.

It is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of a defendant. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). However, there is a difference between the individual opinion of the prosecuting attorney stated as an independent fact and an opinion based upon or deduced from the evidence. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). Prejudicial error occurs when it is clear and unmistakable that counsel is expressing a personal opinion rather than arguing an inference from the evidence. *Id.* at 54.

In closing, the prosecutor discussed George's testimony. George testified that he continued to reside at the house in Graham after Moran-George made the 911 call until he was arrested days later. The prosecutor summarized George's testimony and made the following comments:

> [I]t's the defendant's claim that I still lived there. . . . Despite this ongoing law enforcement investigation into child molestation allegations, I still lived at the house.
> Frankly, that's ridiculous, Your Honor. And that's how you know the defendant was lying when he testified yesterday. It's because the evidence has shown that the defendant is not credible. The evidence has shown that the defendant lied.

4 RP at 446. The prosecutor went on to argue that there were other ways that George's testimony defied common sense and concluded her argument,

> It's for those reasons, Your Honor, the defendant is guilty of child molestation in the first degree for taking her innocence, for subjecting her to the horrors of the world well before she should have ever been subjected to them. Because the evidence has shown beyond a reasonable doubt that he is guilty, I would ask that you return a verdict of guilty as charged.

4 RP at 449.

Although the prosecutor did suggest that George was lying and that he was guilty, she did not express her personal opinion. Instead, she argued from the evidence. The State has wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility, and the prosecutor may argue that the defendant is lying if the prosecutor shows that other evidence contradicts the defendant's testimony. *State v. Thompson*, 169 Wn. App. 436, 496, 290 P.3d 996 (2012).

Because the prosecutor's comments were tied to the evidence and not an independent personal opinion, the comments were not improper. Accordingly, we hold that the prosecutor did not commit misconduct on this basis.

6.    Ineffective Assistance of Trial Counsel

George asserts that his trial counsel was ineffective because she (1) failed to request a competency hearing, (2) talked George into waiving his right to a jury trial, (3) failed to investigate and present evidence on the master bedroom, (4) failed to object to hearsay, (5) failed to ask TK certain questions on cross-examination, and (6) failed to object to the prosecutor's misconduct during closing argument.  We disagree.

a.    Standard of Review

We review claims of ineffective assistance of counsel de novo.  *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014).  To prevail on an ineffective assistance of counsel claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant.  *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011).  We presume that counsel's assistance was effective, until the defendant shows in the record the absence of legitimate or tactical reasons supporting counsel's conduct. *Id.* at 33.

Representation is deficient if after considering all the circumstances, it falls below an objective standard of reasonableness.  *Id.*  Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have been different.  *Id.* at 34.

b.    Competency Hearing

George asserts that his counsel should have known that George had literacy and mental health problems and should have requested a competency hearing under former RCW

10.77.060(1)(a) (2004). He also argues that had such a hearing been held, the trial court would have found him incompetent to stand trial. We disagree.

Under former RCW 10.77.010(14) (2005), incompetency "means a person lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." When defense counsel knows or has reason to know of a defendant's incompetency, counsel's failure to raise competency constitutes ineffective assistance of counsel. *See In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 867, 16 P.3d 610 (2001).

However, there is nothing in the record to suggest that George was unable to understand the proceedings or participate in his defense. Further, nothing in the record indicates that the trial court would have found George incompetent to stand trial if defense counsel had requested a competency hearing. The burden is on the defendant to show deficient representation and prejudice based on the record established in the proceedings below. *Grier*, 171 Wn.2d at 33. Because George has failed to do so, we hold that his ineffective assistance of counsel claim on this basis fails.

c. Waiver of Right to Jury Trial

George asserts that his counsel was ineffective because she convinced him to waive his right to a jury trial. We disagree.

The Sixth Amendment to the United States Constitution and article 1, section 21 of the Washington Constitution provide criminal defendants the right to be tried by jury. However, Washington law allows a defendant to waive a jury trial. *State v. Benitez*, 175 Wn. App. 116, 127, 302 P.3d 877 (2013). We have recognized that competent defendants and experienced

counsel may have good reasons to waive a jury trial, believing their defense would be better understood and evaluated by a judge than by jurors. *State v. Pierce*, 134 Wn. App. 763, 772, 142 P.3d 610 (2006).

Here, the record shows that George knowingly, intelligently, and voluntarily waived his right to a jury trial both in a colloquy with the trial court and in writing. Further, waiving a jury and instead electing for a bench trial in a child molestation case can be a legitimate tactical decision. Nothing in the record indicates that George was pressured into waiving his right to a jury trial. Accordingly, we hold that George's ineffective assistance of counsel claim on this basis fails.

> d.    Failure to Investigate and Present Evidence

George asserts that his counsel's performance was deficient because she failed to investigate the master bedroom and present photographs of the bedroom and locking mechanism on the master bedroom door. We disagree.

The Supreme Court has held that a claim of ineffective assistance of counsel can be premised on defense counsel's failure to adequately investigate. *See State v. Jones*, 183 Wn.2d 327, 347, 352 P.3d 776 (2015). However, the record is insufficient to show that defense counsel's failure to take photos of the master bedroom was deficient performance. George does not allege what the photos would have shown and why they would have been helpful to his defense.

Even assuming that the photos would have contradicted AQ's description of the master bedroom and the lock, it is unlikely that using photos to show that the master bedroom did not conform to AQ's description would have made any significant difference in the outcome of the

trial. George's counsel made repeated and extensive attempts to impeach AQ throughout the trial. Further, AQ's testimony was often uncertain or inconsistent with other witness testimony, but the trial court still found her credible. In light of the fact that George's counsel impeached AQ on more significant issues, the failure to obtain bedroom photographs that would provide relatively minor impeachment value was not prejudicial. Accordingly, we hold that George's ineffective assistance of counsel claim on this basis fails.

e. Failure to Object to Hearsay

George asserts that his counsel was ineffective for failing to object to AQ's hearsay statements, specifically AQ's statements about TK's girlfriend, N, and AQ's friend, K. We disagree.

Counsel's failure to object was not deficient performance. As discussed above, AQ's testimony about N and K never offered any statements for the truth of the matter asserted – there was no hearsay. Therefore, any objection by George's counsel would have been overruled. Accordingly, we hold that George's ineffective assistance of counsel claim on this basis fails.

f. Cross-Examination of TK

George argues that his counsel was ineffective because she failed to ask TK specific questions on cross-examination about TK's statements that he saw George take AQ into the master bedroom four or five times and lock the door. We disagree.

The extent of cross-examination is a matter of judgment and strategy, and we will not find ineffective assistance of counsel based on defense counsel's decisions during cross-examination if counsel's performance fell within the range of reasonable representation. *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). In order to show prejudice, the defendant

23

must show that proper cross-examination would have elicited testimony that could have overcome the evidence of his guilt. *Id.*

Here, George argues that his counsel should have asked TK as follows: (1) "Why did you not knock on the door when it was locked?" (2) "Why did you go to the door in the first place?" (3) "What makes you remember Mr. George and your sister go in the master room, ('exactly five times')?" (4) "What stuck out for you to remember this since you never heard your sister Scream?" SAG at 24.

George's argument fails for two reasons. First, George assumes that TK would not have been able to give satisfactory answers to the proposed questions. But TK may have had satisfying answers to those questions, which would have strengthened his credibility. Therefore, counsel may well have chosen to not ask those questions as a matter of strategy.

Second, even if TK could not answer the proposed questions, his failure to provide answers would not have undermined AQ's testimony. TK's failure to answer the questions would have affected only the credibility of his corroborating testimony, but AQ's testimony that George took her into the bedroom approximately five times and locked the door would remain undisturbed. Therefore, George does not show that proper cross-examination would have been enough to overcome the evidence of his guilt. Accordingly, we hold that George's ineffective assistance of counsel claim on this basis fails.

       g.    Failure to Object to Prosecutor's Improper Statements in Closing

George argues that his counsel was ineffective for failing to object to improper statements made by the State in closing arguments. We disagree.

"In order to show that counsel was ineffective for failing to object to the remarks of the prosecutor, the defendant must show that the objection would have been sustained." *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007). As discussed above, most of the challenged conduct was not improper and, therefore, objections to that conduct would have been overruled.

The prosecutor did commit misconduct in her closing argument by stating that some children never disclose abuse and stating that there is no checklist of behaviors to show a child has been abused. Even assuming that defense counsel's failure to object to these statements was deficient performance, George fails to show how counsel's deficient performance prejudiced him. The exclusion of those statements would not have changed the result of the trial. Accordingly, we hold that George's ineffective assistance of counsel claim on this basis fails.

7. Ineffective Assistance of Appellate Counsel

George argues that his appellate counsel provided ineffective assistance because he did not raise in the main appeal the issues that George raises in his SAG. We disagree.

As discussed above, the issues George raises in his SAG either lack merit or are not properly reviewable on direct appeal. Therefore, his appellate attorney's strategic decision not to raise them was neither deficient nor prejudicial performance. Accordingly, we hold that George's appellate counsel was not ineffective.

ANALYSIS:  FAILURE TO REGISTER AS A SEX OFFENDER

A.      LATE DISCOVERY

With regard to his conviction for failure to register as a sex offender, George argues that the trial court abused its discretion by failing to exclude Officer Dillon's written report as late discovery.  We disagree.

1.      Legal Principles

We review a trial court's discovery decisions based on CrR 4.7 for an abuse of discretion. *State v. Vance*, 184 Wn. App. 902, 911, 339 P.3d 245 (2014), *review denied*, 182 Wn.2d 1020 (2015).  A trial court abuses its discretion when its decision is based on untenable grounds or reasons.  *Id.*

CrR 4.7(a)(1) mandates that the State disclose to the defendant "material and information within the prosecuting attorney's possession or control," including "(i) the names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witnesses."  Further, the prosecutor must "promptly notify" the defendant or defense counsel of the existence of additional material.  CrR 4.7(h)(2).  But the prosecutor's general discovery obligation is limited to "material and information within the knowledge, possession or control of members of the prosecuting attorney's staff."  CrR 4.7(a)(4); *Vance*, 184 Wn. App. at 911.

The trial court may sanction a party for failure to comply with discovery rules.  The court may order "discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances."  CrR 4.7(h)(7)(i).  However, exclusion or suppression of evidence or dismissal for a discovery

violation is an extraordinary remedy that should be applied narrowly. *Vance*, 184 Wn. App. at 911.

2. Officer Dillon's Report

Five days before trial, the State spoke with Dillon and learned that she had written a report about her conversation with George. The State requested a copy of Dillon's report, and Dillon sent a copy to the State that same day. Immediately after receiving Dillon's report, the State forwarded a copy to defense counsel. Defense counsel received the report the next day. George read the report two days later.

Detective Hickman's report mentioned that Dillon had made a tip to Offender Watch based on information from her conversation with George. The State provided Hickman's written report to defense counsel in initial discovery and listed Dillon as a witness. In addition, the declaration of probable cause stated that Dillon provided the tip to Offender Watch and also described her conversation with George.

George moved to exclude Dillon's report, arguing that the late discovery was prejudicial and would require reconsideration of his defense strategy. Notably, George did not ask for a continuance. The trial court recognized that exclusion was the harshest remedy. In light of the fact that George had notice of Dillon from the declaration of probable cause and the State's witness list, the trial court sought instead to find some other mitigating remedy short of exclusion. Accordingly, the trial court made arrangements for George to have an opportunity to speak with Dillon about her report before the CrR 3.5 hearing.

The failure to produce evidence or identify witnesses in a timely manner is appropriately remedied by continuing trial to give the opposing party time to interview a new witness or

prepare to address new evidence. *State v. Hutchinson*, 135 Wn.2d 863, 881, 959 P.2d 1061 (1998). Here, the trial court did exactly that by allowing George time to speak with Dillon before the CrR 3.5 hearing. Accordingly, we hold that the trial court did not abuse its discretion by failing to exclude Dillon's report.

B.     MOTION TO SUPPRESS STATEMENTS

George argues that the trial court erred by denying his motion to suppress the statements he made to Dillon and Hickman. He argues that the statements were made absent *Miranda* warnings while he was in custodial interrogation. We disagree.

1.     Legal Principles

We review challenged findings of fact entered after a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's conclusions of law are supported by its findings of fact. *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). Unchallenged findings of fact are verities on appeal. *State v. Elkins*, 188 Wn. App. 386, 396, 353 P.3d 648, *review denied*, 184 Wn.2d 1025 (2015).

Police must give *Miranda* warnings when a suspect is subject to (1) custodial (2) interrogation (3) by an agent of the state. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary and are therefore inadmissible. *Id.*

For *Miranda* purposes, custody means " 'a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with formal arrest.' " *Rosas-Miranda*, 176 Wn. App. at 779 (quoting *Heritage*, 152 Wn.2d at 218). Custody is examined by the totality of the circumstances. *Id.* Interrogation means any words or actions

on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Miller*, 165 Wn. App. 385, 389, 267 P.3d 524 (2011).

2.    Statements to Officer Dillon

The State argues that George's statements to Dillon were admissible voluntary statements and that *Miranda* warnings were not required because George was neither in custody nor interrogated. We agree.

Dillon met with George in a public place where people were coming and going, and George's boss stood nearby. Dillon was alone. Dillon did not arrest George or put him in handcuffs. George argues that he was not free to leave during his conversation with Dillon, because the subject of the conversation – his missing stepson – compelled him to stay and speak with Dillon. But a reasonable person in George's situation would not have believed that his freedom was curtailed to the degree associated with formal arrest. Therefore, George was not in custody requiring *Miranda* warnings.

George also argues that Dillon's questions amounted to an interrogation because she should have known that asking George if TK had been staying with him would lead to an incriminating response. But Dillon's CrR 3.5 testimony does not indicate that she asked George any questions about his living situation. The topic only came up when George told her that TK had been staying with him over the weekend. Therefore, Dillon did not interrogate George and *Miranda* warnings were unnecessary. Accordingly, the trial court did not err in admitting George's statements to Dillon.

29

3.    Statements to Detective Hickman

The State argues that George's pre-*Miranda* statement to Hickman was admissible because it was a voluntary, spontaneous statement not made in response to interrogation. We agree.

George was in custody and handcuffed when he met with Hickman. Hickman introduced himself and told George he was contacting him about his registered address. But there was no "interrogation" before Hickman gave *Miranda* warnings, because Hickman's words or actions were not reasonably likely to elicit an incriminating response from the suspect. George made the statement at issue – that he had a restraining order that prevented him from living at the Graham house – before Hickman had asked any questions. Incriminating statements that are not made in response to an officer's questions are freely admissible. *State v. Posenjak*, 127 Wn. App. 41, 53, 111 P.3d 1206 (2005). Accordingly, the trial court did not err in admitting George's statement to Hickman.

C.    SUFFICIENCY OF THE EVIDENCE

George argues that the State did not present sufficient evidence to show that he (1) knowingly failed to comply with registration requirements by (2) not living at his registered address (3) for the entire charging period. We disagree.

1.    Standard of Review

As noted above, when evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Homan*, 181 Wn.2d at 105. We will assume the truth of the State's evidence and all reasonable inferences drawn

30

from that evidence when evaluating whether sufficient evidence exists. *Id.* at 106. We will also defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Id.*

2. Legal Principles

RCW 9A.44.132(1) provides that a person commits the crime of failure to register as a sex offender if the person has a duty to register under former RCW 9A.44.130 (2011) and knowingly fails to comply with any of the requirements of former RCW 9A.44.130. If a person who is required to register under former RCW 9A.44.130 moves, he must change his address within three business days of moving. Former RCW 9A.44.130(4)(a)-(b). If a person who is required to register lacks a fixed residence, he must provide signed written notice to the county sheriff within three business days after ceasing to have a fixed address and then report weekly, in person. Former RCW 9A.44.130(5)(a)-(b).

3. Evidence of Knowledge

The evidence showed that George was aware of the registration requirements and had taken action to comply with the requirements in the past. At trial, the State presented evidence of George's registration packet on file with the Pierce County Sheriff's Office. George had completed a form acknowledging that he understood the requirements of the registration law. In addition, George updated his file upon his release from custody in 2007, when he changed employment in 2008, and when he moved to Graham in 2010.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that George knowingly failed to change his address as required.

4.    Evidence of Living Elsewhere

When Dillon spoke with George on April 22, George mentioned that he had been staying with a friend.  On May 2, George told Hickman that he had a restraining order that prevented him from living at his registered address.  George also said that he had separated from his wife about two weeks before and was living mostly out of his car at the cemetery.  George was using the showers and facilities at the cemetery office.  He also confirmed that he had stayed at a friend's house for a couple of nights.

George argues that the evidence is insufficient because he never said he "moved out," but only that he was "*mostly* living" out of his car.  George also argues that his statement to Hickman that he separated from his wife was unclear because separated could include intermittent temporary stays away from the Graham house.  However, George's statement that the protective order prevented him from living at the Graham house allows a reasonable inference that he was not sleeping there or spending time there regularly.  Viewing the evidence in the light most favorable to the State, a rational trier of fact could conclude beyond a reasonable doubt that George had ceased living at the Graham house.

5.    Evidence of the Time Period

The information charged George with failing to comply during the period between March 29 and May 2, 2013.  George argues that even if the evidence shows he was out of his home two weeks prior to May 2 or around the middle of April, the evidence does not show he was out of the house as early as March 29, 2013.

But the State had no burden to show that George was living away from the registered address for the *entire* charging period.  The State was required to show that George only failed to

register his change of residence within three business days of ceasing to live at the Graham house at some point during the charging period. The fact that George left the Graham house in mid-April and spent two weeks staying with his friend and in his car during the charging period is sufficient to show that he failed to comply with registration requirements at some point during the charging period.

D.    FINDINGS OF FACT REGARDING LIVING AT REGISTERED ADDRESS

George argues that there was not substantial evidence to support the following findings of fact made by the trial court: (1) George moved out of the Graham house prior to March 29, 2013 (finding of fact V), (2) George's friend confirmed that George was staying with the friend in Tacoma (finding of fact X), and (3) George was not living at the Graham house and had not been living there for at least two weeks (finding of fact XIV). We hold that (1) substantial evidence did not support the challenged portions of finding of facts V and X and, therefore, they were erroneous, but the error was harmless; and (2) substantial evidence did support finding of fact XIV.

1.    Legal Principles

As noted above, when reviewing the sufficiency of evidence following a bench trial, we determine whether substantial evidence supports the challenged finding of fact and whether the findings support the trial court's conclusions of law. *Smith*, 185 Wn. App. at 956. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the findings are true. *Id.* A defendant challenging a trial court's finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence. *Id.* at 957. "However,

an erroneous finding of fact not materially affecting the conclusions of law is not prejudicial and does not warrant a reversal." *State v. Caldera*, 66 Wn. App. 548, 551, 832 P.2d 139 (1992).

    2.    Finding of Fact V

Finding of fact V states, "The defendant moved out of the [Graham house] prior to March 29, 2013 and did not update his sex offender registration as required." Clerk's Papers (CP) at 597. George argues that there is not substantial evidence to show he moved out of the Graham house before March 29, 2013. We agree.

Dillon testified that when she met with George on April 22, 2013, he told her that he had been staying with a friend, but he did not say for how long he had been staying with the friend. Hickman testified that when he contacted George on May 2, George told him that he had separated from Moran-George about two weeks before. Dillon's and Hickman's testimony is sufficient to support a finding that George moved from the Graham house sometime in mid-April. But substantial evidence does not support the trial court's finding that George moved out prior to March 29.

However, the trial court's conclusions of law were not dependent on the finding that George moved out prior to March 29. As discussed above, the State had no burden to show that George was living away from the registered address for the entire charging period. The relevant issue was whether George lived away from the registered address at some point *after* March 29. Other findings established that fact. Therefore, finding of fact V was not material to the trial court's conclusions of law.

We hold that even though entry of finding of fact V was error because substantial evidence did not support it, the error was harmless.

3.    Finding of Fact X

Finding of fact X states in relevant part, "The defendant admitted he had not been living at the Graham address and claimed he had been staying with his friend in Tacoma. His friend was able to confirm this information and provide an address to Officer Dillon." CP at 598. George challenges the second sentence of the finding because it was based on Dillon's CrR 3.5 hearing testimony, not Dillon's trial testimony. The State concedes that the court relied on evidence from the CrR 3.5 hearing for the second sentence, but argues that the error was harmless. We agree with the State.

In the CrR 3.5 hearing before trial, Dillon testified that George told her that he had been staying with his friend, Raymond McCloud, who was present during the conversation. Dillon testified that McCloud gave her the address of his residence in Tacoma. But at trial, Dillon testified that George stated only that "he was staying with a friend and pointed at his friend that was sitting in the vehicle." 7 RP at 676. Therefore, substantial evidence does not support the second sentence of finding of fact X.

However, both Dillon and Hickman testified at trial that George said he had stayed at a friend's house. And Hickman testified that George said his friend lived in Tacoma and he stayed there for a couple of nights. This testimony supported the first sentence of finding of fact X and was relevant to the failure to register charge. Whether McCloud confirmed that George was living with him and provided an address is immaterial. Accordingly, we hold that even though entry of the second sentence of finding of fact V was error because substantial evidence did not support it, the error was harmless.

4. Finding of Fact XIV

George challenges only the last sentence of finding of fact XIV: "The defendant was clearly not living at the Graham address and had not been for at least 2 weeks." CP at 599. George argues that the testimony did not establish that he was out of his registered home for two consecutive weeks. We disagree.

Hickman testified that George said that a restraining order prevented him from living at the Graham house. George said he had separated from his wife and moved out of the Graham house about two weeks before. George also told Hickman that since the separation he had spent a couple of nights at his friend's house in Tacoma, but the majority of the time he stayed in his car at the cemetery. Hickman's testimony is sufficient to persuade a fair-minded, rational person that George had not been living at the Graham house for two weeks. Accordingly, we hold that substantial evidence supports the last sentence of finding of fact XIV.

E.    COMMENT ON CREDIBILITY

George argues that Hickman made an impermissible comment on George's credibility. The State argues that George waived the issue by failing to object to Hickman's comment at trial and George fails to show that the issue requires review under RAP 2.5(a). We agree with the State.

Under RAP 2.5(a), we may refuse to review any claim of error which was not raised in the trial court. However, a manifest error affecting a constitutional right is reviewable for the first time on appeal under RAP 2.5(a)(3). Before we will review an unpreserved error under RAP 2.5(a)(3), the appellant must show actual prejudice, which requires a plausible showing that the asserted error had practical and identifiable consequences in the trial. *State v. Kalebaugh*,

183 Wn.2d 578, 584, 355 P.3d 253 (2015). A claim alleging that a witness offered impermissible opinion testimony about another witness's guilt or credibility does not necessarily allege manifest constitutional error that will be considered for the first time on appeal under RAP 2.5(a). *City of Seattle v. Heatley*, 70 Wn. App. 573, 585-86, 854 P.2d 658 (1993).

Here, the record shows that George failed to object to Hickman's credibility comment at trial. And George offers no argument in his brief that RAP 2.5(a)(3) applies or that the comments resulted in actual prejudice. Accordingly, we hold that George waived his claim by failing to object at trial.

## CONCLUSION

We affirm George's three convictions for first degree child molestation and his conviction for failure to register as a sex offender.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
JOHANSON, C.J.

37